IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| CLINTON KELLY, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-06-1737 |
| | § | |
| MICHAEL J. ASTRUE,[1] | § | |
| COMMISSIONER OF THE SOCIAL | § | |
| SECURITY ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER GRANTING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Before the Court[2] comes this judicial review of administrative action by the Social Security Administration. Having considered Plaintiff's Motion for Summary Judgment (Document No. 23), Defendant's response thereto (Document No. 25), the administrative record and the decision of the administrative law judge ("ALJ"), this Court ORDERS, for the reasons stated below, that Plaintiff's Motion for Summary Judgment is GRANTED, and this matter is REMANDED to the Commissioner of the Social Security Administration ("SSA") for further proceedings consistent with this opinion.

I.    **Introduction**

---

[1]Michael J. Astrue became the Commissioner of the Social Security Administration in February, 2007. The original petition filed with this Court identifies Jo Anne Barnhart as the defendant, as she was the Commissioner of the Social Security Administration when judicial review was sought. In accordance with Rule 25(d)(1) of the Federal Rules of Civil Procedure, Michael J. Astrue shall be substituted as defendant in this case.

[2]In accordance with 28 U.S.C. §636(c), both parties waived the right to trial before a District Judge and consented to have a United States Magistrate Judge conduct all further proceedings, including the trial and judgment. (Document No. 14, August 31, 2006).

Plaintiff Clinton Kelly ("Kelly") brings this action pursuant to Section 205(g) of the Social Security Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the SSA to deny Kelly disability insurance ("DI") benefits and supplemental security income ("SSI") payments.  Kelly complains that: (1) all existing administrative remedies have been sought and exhausted prior to filing this action for judicial review; (2) the findings of the Commissioner are not supported by substantial evidence; and (3) he is disabled within the meaning of the Social Security Act.  (Document No. 1, May 22, 2006).  The Commissioner's response denies that Kelly is disabled within the meaning of the Social Security Act ("Act") and that Kelly is entitled  to the relief sought.  (Document No. 9, August 4, 2006).

II.    **Administrative Proceedings**

Kelly was initially injured on-the-job on November 1, 2001, suffering a back injury that potentially impaired his ability to use his legs.  (Tr. 245-246).  On March 19, 2003, Kelly applied for both Title II (DI benefits) and Title XVI (SSI) benefits.  (Tr. 54-56; 178-180).  The applications for benefits were supplemented by a disability report, filed on March 19, 2003.  (Tr. 59-68).  The disability report states that Kelly has not been able to work since November 1, 2001, because of degenerative disc disease.  (Tr. 60).  Kelly was denied benefits by the SSA from his initial request and upon reconsideration.  A hearing was requested before an ALJ and granted.  Kelly, together with a vocational expert, appeared before an ALJ on September 28, 2004.  (Tr. 235-256).  On October 26, 2004, the ALJ issued an unfavorable decision to Kelly finding him not disabled.  (Tr. 12-24).

Kelly sought review of the ALJ's decision with the Appeals Council of the SSA, claiming that evidence was improperly evaluated.  (Tr. 11).  The Appeals Council can only review a case if: (1) the ALJ appears to have abused his or her discretion; (2) there is an error of law; (3) the decision

is not supported by substantial evidence; (4) there is a broad policy or procedural issue that may affect the public interest; or (5) new and material evidence is introduced to the record that does not support the decision of the ALJ. 20 C.F.R. §§ 404.970 & 416.1470. After applying these regulations to Kelly's case, the Appeals Council denied Kelly's request for review. (Tr. 5-7). The ALJ's decision thus became a final ruling.

Kelly has a right to judicial review for claims under Title II, as provided in § 205(g) of the Social Security Act. 42 U.S.C. § 405(g). Kelly also has a right to judicial review for claims under Title XVI, as provided by § 1631(c)(3) of the Social Security Act. 42 U.S.C. § 1383(c). Therefore, Kelly was given sixty days to file a civil action and seek judicial review. Kelly filed a timely appeal (Document No. 1, May 22, 2006). Kelly then filed a Motion for Summary Judgment (Document No. 23), to which the Commissioner filed a response in opposition (Document No. 25). This appeal is now ripe for ruling.

III.     **Standard of Review for Agency Decisions**

Judicial review of the Commissioner's decision is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with relevant legal standards." *Jones v. Apfel*, 174 F.3d 692, 693 (5th Cir. 1999); *See* 42 U.S.C. § 405(g). "A district court may not try the issues de novo, re-weigh the evidence or substitute its own judgment for that of the Commissioner." *Francois v. Comm'r of Soc. Sec.*, 158 F. Supp. 2d 748, 756 (E.D. La. 2001) (citing *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995)); *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993); *Selders v. Sullivan*, 914 F.2d 614, 617 (5th Cir. 1993). While a court may not substitute its judgment for that of an agency, a court must consider the entire administrative record in deciding whether a final decision is supported by substantial

evidence. *Francois*, 158 F. Supp. 2d at 757 (citing *Anthony v. Sullivan*, 954 F.2d 289, 295 (5th Cir. 1992)); *Villa v. Sullivan*, 895 F.2d 1019, 1022 (5th Cir., 1990); *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971)(quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). In other words, substantial evidence amounts to "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id*. It does not, however, require a preponderance of the evidence to support agency decisions. *Spellman*, 1 F.3d at 364. "The Commissioner is entitled to make any finding that is supported by substantial evidence, regardless of whether other conclusions are also permissible." *Francois*, 158 F. Supp. 2d at 756. The evidence must create more than a "suspicion of the existence of the fact to be established, but 'no substantial evidence' will be found only where there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

IV.    **Burden of Proof: Entitlement to Disability Designation**

To rightfully claim disability benefits under the Act a plaintiff must prove that he or she is disabled. The Act defines disability as the "inability to engage in substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

The Commissioner has designed regulations and procedures for evaluating disability claims and for determining disability status. 20 C.F.R. §§ 404.1501 - 404.1599, §§ 416.901 - 416.998

(1995).  A five-step evaluation process, where the plaintiff bears the burden of proof during the first

four steps, has been promulgated by the SSA for disability claims. 20 C.F.R.. §§ 404.1520, 416.920.

 At each step, a determination is made by the ALJ as to whether a person is unable to engage in

substantial gainful activity, and once a finding of "disabled" is ascertained, the inquiry ends. *Leggett*

*v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1990);

*Moore v. Sullivan*, 895 F.2d 1065, 1068 (5th Cir. 1990).   The five-step analysis requires

consideration of the following:

> (1) Determining if the claimant is engaged in substantial gainful employment.  If so,
> then a finding of "not disabled" ends the evaluation.  20 C.F.R. §§ 404.1520(b),
> 416.920(b).
> (2) If not engaged in substantial gainful employment, then the claimant is evaluated
> for severe mental or physical impairments that would limit the ability to perform
> basic work functions.  If no such severe impairments exist, then a finding of "not
> disabled" is warranted. 20 C.F.R. §§ 404.1520(c), 416.920(c).
> (3) Whether the injury has lasted or is expected to last for at least one year and the
> impairment meets or exceeds the severity of a listed impairment in 20 C.F.R., Part
> 404, Subpart B, Appendix 1.  Otherwise, the claimant is found "not disabled." 20
> C.F.R. §§ 404.1520(d), 416.920(d).
> (4) Determining if the claimant's residual functional capacity allows for the claimant
> to continue their former employment.  If so, the claimant is found "not disabled." 20
> C.F.R. §§ 404.1520(e), 416.920(e).
> (5) If unable to perform his or her prior occupational duties, then the claimant's age,
> education and work experience are considered in determining whether the claimant
> can perform any job that is available in the national economy.  If there are sufficient
> jobs in the national economy that the claimant is able to perform, then a finding of
> "not disabled" is applied. 20 C.F.R. §§ 404.1520(f)(1), 416.920(f)(1).

In analyzing what employment opportunities exist for a claimant, the ALJ utilizes the Medical

Vocational Guidelines to constructively establish that jobs exist in the national economy. 20 C.F.R.

§§ 404, Subpt. P, App. 2, §§ 200.00 - 204.00, 416.969.   In this final step, a showing by the

Commissioner that the claimant is capable of performing alternative employment shifts the burden

of proof back to the claimant to show that he or she cannot perform such alternative work. *Kraemer*

*v. Sullivan*, 885 F.2d 206, 208 (5th Cir. 1989).

Here, the ALJ found at step four that Kelly was unable to perform his past relevant work.[3] The ALJ further determined, at step five, that Kelly was capable of performing sedentary work[4] and that sufficient jobs exist in the national economy such that he could find gainful employment. This Court must determine, in this appeal, whether substantial evidence supports these findings by the ALJ.

## V.     Discussion

The Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which . . . has lasted . . . for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). That is, there must exist a medically identifiable impairment that lasts for greater than one year. A medically determinable physical or mental impairment must be based on the substantial evidence of the record. The Court "weigh[s] four elements of proof when determining whether there is substantial evidence of disability: (1) objective medical facts; (2) diagnosis and opinions of treating or examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) [the claimant's] age, education, and work history." *Francois*, 158 F. Supp. 2d at 758 (quoting *Martinez v. Chater*, 64 F.3d 172, 174 (5th Cir. 1995)). Each of these four elements will be considered.

### A.     Objective Medical Evidence and Diagnoses of Treating Physicians

---

[3]The phrase "past relevant work" is defined in the Regulations at 20 C.F.R. §§ 404.1565 and 416.965.

[4]"Sedentary work" is defined at 20 C.F.R. §§ 404.1567(a) and 416.967(a). This work classification requires the ability to lift or carry 10 pounds occasionally, to stand or walk for at least two hours in an eight hour workday (with normal breaks), to sit for six hours in an eight hour workday (with normal breaks), and to occasionally stoop or bend. *Id*.

The medical record indicates that Kelly injured his back on-the-job during an electrocution accident on November 1, 2001. (Tr. 245).  From this initial injury, Kelly complained of pain, weakness and limited mobility due to continued discomfort in his back and lower left extremities. (Tr. 139).  Objective medical evidence showed that Kelly suffered from degenerative disc disease that affected his spine at L4-5 and L5-S1, a bulging disc at L4-5 with mild asymmetry to the left and a mild compromise of the proximal neural foramina bilaterally, and a mild bulging disc at L5-S1. (Tr. 233).

Kelly was first treated by Dr. Kahkeshani on December 6, 2001.  On an initial visit, Dr. Kahkeshani observed several physical abnormalities on Kelly's EMG.  These included: (1) left L4-5 radiculopathy,[5] which likely caused muscle weakness in extremities; and (2) denervation[6] in the L4-5 distribution on the left side.  (Tr. 140).  Additionally, it was noted that Kelly suffered from severe pain.  *Id*.  Dr. Kahkeshani prescribed Kelly with a regimen of physical therapy and planned to "give him an epidural steroid injection a couple of weeks from now if he does not [get] better."  *Id*. Additionally, Dr. Kahkeshani suggested that Kelly should take time off from work.  *Id*.

A follow-up visit with Dr. Kahkeshani occurred on January 7, 2002.  (Tr. 139).  Dr. Kahkeshani reported that Kelly's neck pain was "a lot better," but noted that Kelly still had back pain and "radicular symptoms in L4-L5 distribution of the left lower extremity."  *Id*.  The pain was described as "severe."  *Id*.  At this time, Dr. Kahkeshani again suggested the possible use of epidural

---

[5] Radiculopathy is defined as involving the nerve root and most commonly affects the fifth lumbar (L5) nerve root which may be irritated or compressed by the tissue filling the defect or by narrowing of the nerve pathway.  4-11 Attorney's Textbook of Medicine (Third Edition) P 11.30. Radiculopathy causes weakness of muscles in an extremity.  5-39 Social Security Practice Guide § 39.03.

[6]Denervation: "Excision, incision, or blocking of a nerve supply."  Taber's Cyclopedic Medical Encyclopedia at 1010 (2005).  "Denervation" is the condition of having the nerve supply cut or interrupted.  *Prentice v. Apfel*, 11 F. Supp. 2d 420, 423 (D.N.Y. 1998).

steroid injections to ease the pain and also stated that Kelly should "remain off work for the time being due to work related injuries . . . [from a] disc herniation at L4-L5 with lumbar radiculopathy at L4-L5." *Id*.

On January 23, 2002, Dr. Kahkeshani performed an operative procedure to further evaluate Kelly's injury. (Tr. 138). Epidurography of the L4-L5 epidural space, using an injected fluorescent dye and magnetic resonance imaging (MRI) techniques, allowed Dr. Kahkeshani to evaluate the extent of Kelly's injuries. Kelly was diagnosed with both a disc herniation at L4-L5 and lumbar radiculopathy. *Id*. Dr. Kahkeshani also gave Kelly an epidural steroid injection, at the level of L4-L5, to help alleviate some of Kelly's pain. *Id*. This same procedure and treatment was repeated one week later. (Tr. 137). The diagnosis of Kelly's condition remained the same. *Id*.

A similar procedure was performed again on February 6, 2002. (Tr. 136). However, rather than examining the L4-L5 intervertebral space as before, this procedure instead produced an epidurogram of the L5-S1 epidural space. *Id*. Kelly was also given an epidural steroid injection at the level of L5-S1. *Id*. Dr. Kahkeshani expanded his diagnosis to include disc herniation at both L4-L5 and at L5-S1, together with lumbar radiculopathy. *Id*. It was also reported that Kelly did not respond to the first two epidural steroid injection treatments; therefore, the third epidural injection was given at L5-S1. (Tr. 135).

On March 22, 2002, Kelly again visited Dr. Kahkeshani and complained of severe pain. (Tr. 132). According to Kelly, the pain "goes to the left lower extremity in the L4 and L5-S1 distribution." *Id*. At this point, Kelly was described as taking Oxycontin, Vicodin, and Soma to control his pain. *Id.*

Kelly was next evaluated by Dr. George Kevorkian, on April 16, 2002. (Tr. 86-89). This examination was done at the request of Safety National Casualty Corporation, a workers

compensation carrier.  After a physical examination of Kelly, Dr. Kevorkian reported that Kelly

"walked basically listed and tilted over to the right putting the bulk of his weight during the gait

cycle on his right leg."  *Id*. at 87.  Kelly was unable to do heel or toe walking.  *Id*.  Additionally, Dr.

Kevorkian reported:

> He gave way to manual muscle testing.  I am not sure of the accuracy of my test.  I
> thought that he did not have a conclusive abnormality to muscle testing, but there was
> some giving way especially when examining him in the toes and the feet.  Straight
> leg raising [was] limited at about 45 degrees bilaterally due to complaints of back
> pain and thigh pain.  This was true on either side.

*Id*. at 88.  Dr. Kevorkian concluded that as of April 16, 2002, Kelly had not reached a level of

maximum medical improvement ("MMI").  *Id*. at 89.  Dr. Kevorkian recommended physical therapy,

a surgical evaluation, and a CT myelogram to better assess and treat Kelly's condition.  *Id*. at 88.

Under the orders of Dr. Kahkeshani, a CT scan of Kelly's lumbar spine with contrast was

performed on May 6, 2002. (Tr. 123-131).  The first CT myelography study produced axially-stacked

images of both bone and soft tissue from the patient's mid section through S1.  Dr. Fred Quenzer, Jr.

concluded from the CT scan that:

> There is minimal nuclear protrusion impinging upon the ventral aspect of the
> subarachnoid space at the L4-5 level.  This does not impinge upon or deform the
> thecal sac or the exiting nerve roots.
>
> The cul-de-sac is posteriorly at L5-S1 and shows no evidence of disc protrusion.
> The D12-L1, L1-2, and L2-3 interspace levels are normal.

*Id*. at 123.  A second CT myelography procedure was then performed that created a three dimensional

axial image of the L2-3, L3-4, L4-5, and L5-S1 interspace levels.  This procedure utilized images of

both bone and soft tissue.  Dr. Quenzer concluded:

> The L5-S1 level is normal.

> Broad based subligamentous nuclear protrusion is present at L4-5, abutting upon the ventral aspect of the thecal sac and on these inclined axial images appears to extend out into the neural foramina bilaterally but does not impinge upon the nerve roots.
>
> The L3-4 and L2-3 levels are normal.

*Id*. at 124.  Dr. Quenzer concluded that the protrusion at L4-L5 does "not impinge upon or deform the nerve roots on either side."  *Id*.  It was reported, however, that "there is impingement on the dye column from the ventral aspect at L4-5 consistent with minimal nuclear protrusion."  *Id*. at 125.  Dr. Kahkeshani's follow-up notes suggested that Kelly should be sent to "Dr. MacDougall for consideration of surgery because of the abnormal myelogram the patient had."  (Tr. 122).

After Dr. MacDougall's surgical consultation, Dr. Kahkeshani again visited with Kelly on June 17, 2002.  (Tr. 121).  Kahkeshani reported that Kelly "has a broad-based disc protrusion at L4-5, which may extend to the neural foramina bilaterally."  *Id*.  However, Dr. MacDougall did not suggest that Kelly was a candidate for surgery to correct these abnormalities.  *Id*.  Kelly was seen as being in "severe pain" and continued with his current pain medications, although Dr. Kahkeshani decided to "stop his Oxy-Contin because of fear of habit formation."  *Id*.  Kelly was further prescribed a regimen of physical therapy for three weeks.  *Id*.

Kelly next received epidural steroid injections at the L4-L5 epidural space, the left side of the L4-L5 epidural space, and the L5-S1 joint space.  (Tr. 118-120).  Dr. Kahkeshani diagnosed Kelly with both lumbar radiculopathy and disc protrusion at the level of L4-L5.  Unfortunately, on July 22, 2002, Dr. Kahkeshani reported little improvement in Kelly's condition from the three steroid treatments.  (Tr. 117).  Kelly was prescribed a continued regimen of physical therapy and pain medications.  *Id*.

After roughly two months of physical therapy, Kelly was again seen by Dr. Kahkeshani on September 12, 2002.  (Tr. 116).  Dr. Kahkeshani reported that "[the] patient has finished physical

therapy but does not seem to have gotten any better as far as his pain is concerned." *Id*. Dr. Kahkeshani believed that Kelly's "level of pain has not subsided so that [he] can return back to work." *Id*. Dr. Kahkeshani again stated that a "discogram of the lumbar area would be indicated in order to establish the cause of his pain." *Id*. According to Dr. Kahkeshani's diagnosis, Kelly suffered severe pain, but he could not pinpoint a distinct source. Therefore, Dr. Kahkeshani ordered a discogram[7] in an attempt to further explain Kelly's pain.

Kelly was next treated for back pain on September 22, 2002, in the Emergency Room of San Jacinto Hospital. (Tr. 159-64). At this time he was prescribed both morphine and valium to relieve what he described as very intense pain (10 on a scale of 1 to 10 with a 10 being the most serious level of pain). *Id*. at 159. The accompanying neurological assessment report suggested that Kelly suffered from "left leg weakness" at the time of his hospital visit. *Id*. at 164. Kelly was discharged from the ER after roughly one hour. *Id*. at 159.

On September 27, 2002, Kelly was again seen by Dr. Kahkeshani (Tr. 115). Kelly described his pain as "excruciating" and he was "almost in tears because of the pain." *Id*. A physical examination revealed a positive straight leg raise ("SLR") and "[m]ild weakness of dorsi flexion of the left foot was noted. Numbness at 5 distribution was noted." *Id*. Dr. Kahkeshani again requested that a discogram be performed. *Id*.

Dr. Kahkeshani saw Kelly again on October 23, 2002, and noted that he had treated Kelly for almost one year without improvement. (Tr. 114). Two major diagnostic procedures were performed on Kelly to this point: (1) an MRI, which showed disc protrusion and bulging at L4-L5; and (2) a

---

[7]A discogram is a diagnostic procedure where a fluorescent dye is injected into the discs themselves. A CT scan of the dye distribution can then show the presence and locations of annular tears, scarring, bulges, and other disc abnormalities that might serve as the source of a patient's back pain.

myelogram and post myelogram CT scan of the lumbar spine, which showed "broad based subligamentous disc protrusion at L4-L5." *Id*. Dr. Kahkeshani described these findings as revealing "borderline abnormalities" which might explain Kelly's pain, but felt that a discogram was needed to determine whether his condition might be improved by surgical intervention. *Id*. Dr. Kahkeshani again requested that the insurance company allow Kelly to undergo a discogram procedure to pinpoint the source of his pain. *Id*.

Dr. Kahkeshani made several more recommendations for Kelly to receive this discogram. (Tr. 112-113). In each medical report, Dr. Kahkeshani discussed that there was no "good diagnosis" for Kelly and his back pain. Kelly also sought a second opinion from a neurosurgeon, Dr. MacDougall, but there is no record of that consultation.

Kelly was next seen by the examining physician for the insurance carrier, Dr. Kevorkian, on December 5, 2002. (Tr. 83-85). Dr. Kevorkian classified Kelly as having a permanent partial impairment rating of 5%, as per the *AMA Guides to the Evaluation of Permanent Impairment, fourth edition*. *Id*. at 83. Dr. Kevorkian noted that Kelly had been in severe pain since his injury in November of 2001. *Id*. at 84. Kelly was prescribed Neurontin (100 mg, 2-3 times a day), Soma (350 mg, several times a day), and Vicodin (undisclosed amount and frequency). *Id*. Dr. Kevorkian reported that Kelly was evaluated by a spine surgeon, had appropriate physical therapy, and had taken pain medications. In Dr. Kevorkian's opinion, "he is there for a [sic] reached maximal medical improvement as I see him today . . . I do not think there is any active medical or surgical treatment, which is going to make a marked change in his clinical condition." *Id*. at 85. Dr. Kevorkian agreed that Kelly is unable to perform his previous job as a maintenance worker, but might be able to perform some other type of work. *Id*.

Dr. Kahkeshani received Dr. Kevorkian's medical report and discussed the findings in a medical entry dated December 16, 2002. (Tr. 111). Dr. Kahkeshani again emphasized that Kelly "continues to have pain with no answer for it." *Id*. Dr. Kahkeshani further stated that he requested a discogram for Kelly, and that "[t]his patient, by no means, has reached his maximal medical improvement . . . I am in disagreement with the report of Dr. Kevorkian . . . He is not at medical MMI yet, since his pain has not resolved." *Id*. Dr. Kahkeshani therefore continued to request that Kelly be given a discogram to discern the source of Kelly's back pain. *Id*. Dr. Kahkeshani re-examined Kelly on January 6, 2003, and again recommended a discogram procedure. (Tr. 110).

On January 12, 2003, a residual functional capacity form was completed by a doctor for the SSA. (Tr. 90-97). This report issued Kelly a primary diagnosis of "herniated disc at L4-L5" and a secondary diagnosis of "disk protrusion." *Id*. at 90. Kelly's exertional limitations included: (1) the ability to occasionally lift and/or carry 50 pounds; (2) the ability to frequently lift and/or carry 25 pounds; (3) the ability to stand and/or walk (with normal breaks) for a total of about 6 hours in an 8-hour workday; (4) the capacity to sit (with normal breaks) for a total of about 6 hours in an 8-hour workday; and (5) the unlimited ability to push and/or pull with both the upper and lower extremities. *Id*. at 91. Kelly was further found able to climb, balance, stoop, kneel, crouch, and crawl on an "occasional" basis.[8] *Id*. at 92. The report suggested that Kelly had no manipulative, visual, communicative, or environmental limitations. *Id*. at 93-94. Finally, the severity of Kelly's symptoms and their alleged effect on his functional abilities was described as "credible, but not considered disabling." *Id*. at 95. In the additional comments section of the report, the examining physician made the following observations: (1) an MRI shows a bulging disc (minor) at L4-L5; (2) an MRI of the hip

---

[8]"Occasionally" is defined by Form SSA-4734-BK as "occurring from very little up to one-third of an 8-hour workday (cumulative, not continuous)."

was normal; (3) no other significant abnormalities were found, but claimant continues to have much pain; (4) a discogram has been recommended but not performed; and (5) despite treatment, Kelly has not shown significant improvement, and "unfortunately he does not have a good diagnosis to explain such severe pain he is experiencing." *Id*. at 97.

On the following day, January 13, 2003, Kelly was seen again by Dr. Kahkeshani. (Tr. 109). He was noted as being "in severe pain" and that his "pain has deteriorated and medication doesn't work for him." *Id.* Dr. Kahkeshani requested that Kelly reduce his Vicodin consumption, although no quantities are specified in the medical reports. Dr. Kahkeshani also recommended that Kelly have a discogram procedure. Similarly, on January 27, 2003, Dr. Kahkeshani evaluated Kelly and again noted his pain and requested a discogram. (Tr. 108).

On February 3, 2003, Kelly was again seen by Dr. Kahkeshani. (Tr. 107). At this visit, Kahkeshani noted that "[h]e continues to have significant back pain with radiation to the lower left extremity. Minor abnormality was noted, but was not significant enough to explain so much pain." *Id*. Dr. Kahkeshani further explained that Kelly's pain is "genuine" and that Kelly "does require taking a large quantity of pain medication." *Id*. Dr. Kahkeshani again recommended that Kelly not return to work until his condition improved. *Id.* Kelly again saw Dr. Kahkeshani for continuing pain on February 24, 2003. (Tr. 106). Dr. Kahkeshani continued Kelly on a regimen of: (1) 300 mg of Neurontin, three times per day; (2) 20 Vicodin pills per week; and (3) 15 Soma pills per week. *Id*. Kahkeshani again requested that Kelly undergo a discogram to determine the source of his extreme pain.

Following an additional emergency room visit for pain on March 16, 2003, Kelly had a follow-up visit with Dr. Kahkeshani (Tr. 154-5; 105). Dr. Kahkeshani noted that Kelly had been to the emergency room three times to treat his back pain. *Id*. at 105. Dr. Kahkeshani diagnosed Kelly

with a disk herniation at L4-L5, "although abnormality was relatively minor." *Id.* At this time, Dr. Kahkeshani formally requested both a discogram of the L-spine and an MRI of the hip. *Id.*

In addition to the above-described medical visits, Kelly sought treatment from Dr. Kahkeshani on fifteen other occasions. These can be summarized as follows: (1) September 11, 2003: no improvement in Kelly's pain and concern over dosage of pain medications. (Tr. 102); (2) October 13, 2003: prescription of pain medications. (Tr. 101); (3) November 13, 2003: monitoring quantity of prescription pain medications. (Tr. 100); (4) December 15, 2003: continued report of pain and prescription of pain medicine. (Tr. 99); (5) January 15, 2004: report of pain, but with "no significant abnormality." (Tr. 175); (6) February 19, 2004: trying to reduce quantity of pain medications, although pain has not subsided. (Tr. 174); (7) March 22, 2004: continued to reduce quantity of pain medications. (Tr. 173); (8) April 22, 2004: only minor bulging observed in L4-L5 disk, which doesn't fully explain the extent of Kelly's pain. (Tr. 172); (9) May 4, 2004: still no progress reported in controlling pain, but concern expressed over addiction to pain medications. (Tr. 171); (10) June 7, 2004: a similar concern stated over the lack of progress in treatment of pain. (Tr. 170); (11) August 9, 2004: Dr. Kahkeshani continued to reduce the quantity of prescribed pain medications and was "not prepared to prescribe any more without a further diagnosis." (Tr. 219); (12) September 9, 2004: still no explanation for pain. (Tr. 220); (13) October 25, 2004: Dr. Kahkeshani again requested a discogram to find the source of Kelly's pain. (Tr. 218); (14) January 3, 2005: Kelly returned from an emergency room visit for the treatment of severe back pain and Dr. Kahkeshani utilized epidural steroid injections at L4-L5. (Tr. 221); and (15) February 3, 2005: facet block performed on Kelly at L4-L5 and L5-S1, but with little reduction in pain. (Tr. 222).

On March 29, 2005, a discogram was obtained using a CT lumbar scan on Kelly's back. (Tr. 233). This procedure, which Dr. Kahkeshani had repeatedly requested, revealed two causes for

Kelly's severe pain: (1) the existence of extensive annular tears in L4-L5 anterior intervertebral disc and a diffuse bulge; and (2) a small annular tear, left posterior at L5-S1, which "does not cause significant canal stenosis." *Id.*  On April 11, 2005, Dr. Kahkeshani followed-up this preliminary radiology report with an evaluation of the CT data.  (Tr. 223).   Here, Dr. Kahkeshani stated that:

> [the] patient has a very extensive/large annular tear along the disk, both anteriorly and posteriorly with diffuse bulging causing central canal/lateral recess and neural foraminal stenosis.  This is the etiology of his pain, which was not detected in the previous studies and MRIs we did for him.

*Id.*  Dr. Kahkeshani further suggested that Kelly "needs to get a neurosurgical consultation as soon as possible."  *Id.*  In another follow-up report, Dr. Kahkeshani noted that "[this] abnormality is consistent with the patient's pain."  (Tr. 224).  Thus, the CT procedure revealed the underlying pathology and source of Kelly's severe pain.

The final progress note in the administrative record was dated May 12, 2005.  (Tr. 226-27).  Here, Dr. Kahkeshani noted that Kelly is still in severe pain.  *Id.*  Dr. Kahkeshani also wanted to send Kelly for further surgical evaluation.  Dr. Kahkeshani felt that Kelly had reached "[a] statutory maximum medical improvement; however, I think he requires to be evaluated further to see if medically anything else can be done for him."  (Tr. 228).

Having reviewed the objective medical record and medical diagnoses, it is clear that Kelly suffers from severe back pain that originated from an on-the-job injury in 2001.  Kelly has undergone extensive magnetic resonance imaging, which shows degenerative disc disease at L4-L5 and L5-S1 and a bulging disc at L4-L5.  After four years of suffering from apparently unexplained back pain, a CT scan of the lumbar spine, performed in 2005, revealed that Kelly had suffered from extensive annular tears in the L4-L5 intervertebral disk anterior.  An examination of the full medical record and the evidence before the ALJ and the Appeals Council, together with their unfavorable decision,

suggests that all of the evidence used to evaluate Kelly's disability claim was not fully considered. Therefore, neither the objective medical evidence factor nor the expert medical opinion factor supports the final decision of the Commissioner that Kelly is not disabled.

### B.   Subjective Evidence of Pain and Disability

A claimant's pain and subjective symptoms must be considered in deciding if a claimant is disabled. 20 C.F.R. §§ 404.1529 & 416.929. "Pain, alone or in conjunction with other impairments, may be disabling, and the secretary is obliged to weigh subjective evidence of its existence." *Dellolio v. Heckler*, 705 F.2d 123, 127 (5th Cir. 1983).  The Fifth Circuit has held that pain becomes disabling "when such pain is constant, unremitting, and wholly unresponsive to therapeutic treatment." *Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994).  Additionally, the Commissioner is required to consider the "type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate pain or other symptoms." *Francoi*s, 158 F. Supp. 2d at 769; 20 C.F.R. § 404.1529(c)(3)(iv).  Finally, in determining whether a claimant's pain is disabling, "the first consideration is whether the objective medical evidence shows the existence of an impairment that could reasonably be expected to produce the pain alleged." *Francois*, 158 F. Supp. 2d at 763.

In the present case, the ALJ did  not find an impairment that could reasonably explain Kelly's pain.  This is because the ALJ had not considered the medical record as a whole.  Rather, the ALJ only considered the MRI-portion of the record, where the underlying pathology of Kelly's injury and pain had not been resolved.  In the record Kelly describes his pain as being "10/10" or "9/10", a fact that is not discussed in the ALJ's report.  Finally, the ALJ believed that Kelly's pain could be managed by "properly regulated medications, [where] his side effects would be non-severe.  Thus, the undersigned concludes that the claimant's alleged side-effects from his medications are nonsevere." (Tr. 16-17).  However, there is evidence that the ALJ and the Appeals Council failed to

completely consider the medications that Kelly has been prescribed, their known side-effects, or alternative treatment options.  The disregard of Kelly's pain and the ALJ's suggestion that Kelly's pain medications could be better regulated are not supported by any medical evidence.  Therefore, without relying upon any evidence for alternative pain management and improperly substituting his judgment for that of a physician, the ALJ erred.  An ALJ "must not succumb to play doctor and make their own independent medical findings." *See Rohan v. Chater*, F.3d 966, 970 (7th Cir. 1996).

Additionally, an ALJ is charged with evaluating a claimant's statements about his pain, its intensity and persistence, and other symptoms that could limit one's ability to work.  "For subjective complaints of pain to be found as disabling and not subject to a credibility decision` there must be objective medical evidence of a demonstrable condition reasonably expected in medical probability to produce a level of pain which is disabling." *Bolton v. Callahan*, 984 F. Supp. 510, 514 (N.D. Tex. 1997).  In the present case, the ALJ did consider Kelly's constant and consistent complaints about pain.  Kelly's complaints of pain are corroborated by the objective medical record, where he repeatedly complained of and sought treatment for back pain.  However, there is no mention in the record that the side-effects of the medications were troubling to Kelly, nor that Kelly tried to use other medications to lessen his perceived side-effects.  Nonetheless, Kelly was consistently prescribed medication to treat pain, a fact consistent with his being in continuous pain.  The Eighth Circuit has stated that "'consistent diagnosis of chronic . . . pain, coupled with a long history of pain management and drug therapy' was an objective medical fact supporting a claimant's allegations of disabling pain." *O'Donnell v. Barnhart*, 318 F.3d 811, 817 (8th Cir. 2003) (quoting *Cox v. Apfel*, 160 F.3d 1203, 1208 (8th Cir. 1988)).  Thus, in the present case, Kelly's consistent diagnosis of chronic pain by Dr. Kahkeshani, coupled with a four year history of pain management and drug therapy, supports Kelly's complaints of disabling pain.  Additionally, the CT discogram scan of Kelly's lumbar region

provides the final piece of evidence to medically support Kelly's allegations of disabling pain.  Thus,

the subjective evidence of pain factor also does not support the  final decision of the Commissioner

that Kelly is not disabled.

### C.    Claimant's Age, Education, and Work History

Step five of a disability analysis can use the Medical-Vocational guidelines ("Grids") to

determine a claimant's disability status.  20 C.F.R. Part 404, Subpart P, Appendix 2.   In essence, this

final step determines that if an otherwise "disabled" claimant can perform substantial alternative work

in the national economy, then a designation of "non-disabled" is appropriate.   The Grids are

appropriately used when a claimant suffers only from exertional[9] impairments, or when a claimant's

nonexertional[10] impairments do not significantly affect his residual functional capacity ("RFC").  20

C.F.R. § 404.1569.   The decision that alternative work opportunities exist must be supported by

substantial evidence, by  either: (1) testimony from a vocational expert; or (2) administrative notice

from the Grids.  It should be noted that the Grids may only be relied upon in the case of a claimant

who suffers exertional limitations.   Otherwise, testimony from a vocational expert is required to

establish that the claimant can perform some jobs in the national economy.

The Fifth Circuit has held that a claimant who can not sit or stand for prolonged periods of

time because of disabling pain prevents the use of the Grids for determining available work.  *Lawler*

*v. Heckler*, 761 F.2d 195, 198 (5th Cir. 1985).  In *Lawler*, once the Commissioner had accepted

Lawler's assertion that she could not stand or sit for prolonged periods of time, her fact situation no

_____

[9]Exertional limitations include claimant's pain and symptoms that affect his or her ability to
meet the strength demands of a job.  20 C.F.R. § 404.1569a(a).

[10]Non-exertional limitations include those imposed by the claimant's impairments or
symptoms that affect one's ability to meet non-strength demands for a job.  20 C.F.R. §
404.1569a(C)(1).

longer corresponded with the assumptions of the Grids. *Id*. The Fifth Circuit remanded the case to the Commissioner and required the Commissioner to instead rely upon expert vocational testimony. *Id*. Therefore, to use the Grids in Step Five of an analysis, a claimant must meet and match all of the specified criteria for a given exertional work category.

In the present case, the ALJ determined that Kelly suffered from a severe non-exertional limitation, back pain. (Tr. 23, finding no. 3). Thus, the use of the Grids alone was not appropriate. A residual functional test, performed on January 12, 2003, revealed that Kelly suffered from a herniated disc at L4-5 and disc protrusion. (Tr. 90). While this examination did not give Kelly a good diagnosis to explain the source of severe pain, later CT scans do reveal a better diagnosis to explain Kelly's pain. (Tr. 233). This later diagnosis, however, was not considered in the final decision denying Kelly benefits. Additionally, during testimony before the ALJ, Kelly stated that he was required to lay down several times each day and was unable to complete an eight-hour workday. On the basis of this statement, the vocational expert stated that such an individual would not be able to perform a full range of sedentary work. (Tr. 255). Nonetheless, the ALJ relied upon the testimony of this vocational expert that sufficient jobs existed in the national economy at the sedentary exertional level, even though Kelly did not fully fit into the category of sedentary worker. Thus, similar to *Lawler*, Kelly's testimony that he could not sit down or stand for prolonged periods of time misaligned him with the exact requirements of the Grids for sedentary work. The reliance on the Grids was therefore in error.

Additionally, the vocational expert was not properly utilized by the ALJ in the present case. In Step Five of an analysis, a vocational expert can be used to establish that jobs exist in the national economy such that a claimant is qualified to perform these jobs. However, the burden is not satisfied by placing on the record the testimony of a vocational expert who recites job classifications solely

upon the authority of the Dictionary of Occupation Titles.  *Branham v. Gardner*, 283 F. Supp. 293,

294 (W.D. Va. 1968).  Rather, the vocational expert bears the burden of expressing an opinion on the

type of work a given plaintiff can perform and whether that job is available in the vicinity of the

claimant.   In the present case, the vocational expert considered the job classifications for

hypothetically disabled or sedentary-limited workers, while not considering the distinct situation of

the plaintiff Kelly.  This was in error.

> Finally, the ALJ's report stated:
>
> The Medical-Vocational Guidelines may be used to direct an unfavorable decision
> only if the claimant has the exertional residual capacity to perform substantially all .
> . . of the seven primary strength demands required by work at the given level of
> exertion . . . and ***there are no nonexertional limitations***.  When all of the criteria of
> a Medical-Vocational Rule are met, the existence of occupations in the national
> economy is met by administrative notice.

(Tr. 22, emphasis added).  Thus, the ALJ's own language discounts his use of the Medical-Vocational

Guidelines in the present situation.  The ALJ previously determined that Kelly suffers from back pain,

a nonexertional limitation.  Therefore, based on the ALJ's statement alone and the fact that Kelly

suffers from a nonexertional impairment, the use of the Grids was not appropriate and was in error.

## VI.    Conclusion and Order

Considering the record as a whole, the undersigned is of the opinion that the ALJ

determination of disability status is not supported by substantial evidence, and it is

ORDERED that Plaintiff's Motion for Summary Judgment (Document No. 23) is GRANTED, and this proceeding is REMANDED to the Commissioner for further proceedings consistent with this opinion.

Signed at Houston, Texas, this 1St day of August, 2007.

Frances H. Stacy
United States Magistrate Judge